## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

v.

Case No. 25-CR-31 (BAH)

ADRIAN THOMPSON

### <u>MOTION TO DISMISS</u>

Adrian Thompson, through undersigned counsel, respectfully requests this Honorable Court grant his motion to dismiss his one-count indictment for violation of 18 U.S.C. § 922(g)(1). For the reasons that follow, Mr. Thompson argues that 18 U.S.C. § 922(g)(1) violates the Second Amendment to the United States Constitution.

### INTRODUCTION

Federal law prohibits Mr. Thompson from possessing any firearm because he has a past felony conviction.  18 U.S.C. § 922(g)(1). This statute violates the Second Amendment to the United States Constitution, which codifies "the right of the people to keep and bear Arms," both facially and as applied to Mr. Thompson.  In *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022), the Supreme Court upended the framework for evaluating the constitutionality of firearm regulations.  Now, if "the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2129-30.  To rebut the presumption, the government must show that a challenged law "is consistent with the Nation's historical traditions of firearm regulation." *Id.*  This test is demanding.  A firearm regulation is consistent with American tradition only if similar regulations were widespread and commonly accepted in the founding era, when the Second Amendment was adopted. *See id.* at 2131.  Both facially and as applied to Mr. Thompson, § 922(g)(1) cannot survive after *Bruen*.

## ARGUMENT

### I.  *Bruen* changed the standard for evaluating firearm regulations under the Second Amendment.

The operative clause of the Second Amendment provides that "the right of the people to keep and bear arms, shall not be infringed." U.S. Const. amend. II.  That right is not bestowed on the people by the federal government; rather, the Second Amendment codified a pre-existing "individual right to possess and carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008).  This pre-existing right is not "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *McDonald*, 561 U.S. at 780.

Before *Bruen*, the D.C. Circuit joined other circuits in using a two-step test for Second Amendment challenges.  That test required courts to determine (1) "whether the challenged law burdens conduct protected by the Second Amendment," and if so, (2) whether the government could show that the regulation is "substantially related to an important governmental objective." *Schrader v. Holder*, 704 F.3d 980, 989 (D.C. Cir. 2013); *see also Medina*, 913 F.3d at 152 (same).

In *Bruen*, the Supreme Court emphatically rejected that two-step approach, holding "it is one step too many."  142 S. Ct. at 2127.  The Supreme Court instead adopted a "text-and-history standard" for evaluating Second Amendment challenges—*i.e.*, the textual component is now step one, and the historical component is now step two.  *Id.* at 2138.  This standard's textual component requires courts to answer a simple preliminary question—whether "the Second Amendment's plain text covers an individual's *conduct*." *Id.* at 2126 (emphasis added).  If it does, then "the Constitution presumptively protects that conduct." *Id.*

The burden then shifts to the government to rebut the presumption under the historical component. *Id.* To do so, the government cannot follow the old playbook of showing that the challenged law promotes an important interest. *See id.* Instead, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* Only a law that is consistent with the Nation's historical tradition is constitutional under the Second Amendment. *Id.*

## II.    18 U.S.C. § 922(g)(1) is unconstitutional facially and as applied to Mr. Thompson.

### A.  The Second Amendment protects Mr. Thompson's alleged conduct under § 922(g)(1)

The Second Amendment "presumptively protects" Mr. Thompson's possession of firearms. Before turning to the historical analysis, counsel anticipates that the government will try to claim that Mr. Thompson is not part of the "the people" mentioned in the Second Amendment's plain text because he has a felony conviction. The government is wrong.

*First*, *Bruen, Heller, and Rahimi*, foreclose the argument that felons are not part of the people because all recognized the "strong presumption" that the text of the Second Amendment confers an individual right to keep and bear arms that belongs to "all Americans," not an "unspecified subset." *Heller*, 128 S.Ct. at 2790–91. In *Rahimi*, the Solicitor General attempted to limit the scope of the Second Amendment to only "responsible" or "law-abiding" citizens. *See U.S. v. Rahimi*, No. 22-915, Gov't Br. at 6, 11-12 (arguing that "the Second Amendment allows Congress to disarm person who are not law-abiding, responsible citizens" and highlighting that *Bruen* "used the term 'law-abiding, responsible citizens' and its variants more than a dozen times to describe the Amendment's scope.'"). But the Supreme Court unequivocally rejected that argument. *See Rahimi*, 144 S. Ct. at 1903 ("[W]e reject the Government's contention that Rahimi

[could] be disarmed simply because he is not 'responsible'"). *Rahimi*, 144 S. Ct. at 1903. As the Court explained, "such a line" does not "derive from our case law." *Id.* And any suggestion otherwise was based on a misreading of the Court's prior decisions because they "said nothing about the status of citizens who were not responsible," as that "question was simply not presented." *Id.* In his dissent, Justice Thomas agreed with the majority on this point, noting that "[t]he Government's claim that the Court already held the Second Amendment protects only 'law-abiding, responsible citizens' is specious at best;" in reality, the "test is the Government's own creation, designed to justify every one of its existing regulations" with "no doctrinal or constitutional mooring." *Id.* at 1944-95 (Thomas, J., dissenting). Thus, *Rahimi* dooms any attempt to limit "the people" to "responsible" or "law-abiding" citizens. *See id.* at 708 (Gorsuch, J. concurring) ("In this case, no one questions that the law Mr. Rahimi challenges addresses individual conduct covered by the text of the Second Amendment").

**Second**, the "plain text" of the Second Amendment does not exclude felons from its protection. Just as the amendment's text does not "draw[] a home/public distinction with respect to the right to keep and bear arms," it does not draw a felon/non-felon distinction. *Bruen*, 142 S. Ct. at 2134. It refers only to "the people." U.S. Const. amend. II. Under *Bruen*, the "plain text" is what controls and "[n]othing in the Second Amendment's text" excludes those who have been convicted of a felony from its protection. *See id.*

**Third**, founding era dictionaries define "people" as "those who compose a community," and extend to "every person." *See, e.g.*, 2 Samuel Johnson, *A Dictionary of the English Language* (1766) ("A nation; those who compose a community")[1]; Thomas Dyche & William Pardon, A

---

[1] Available at https://tinyurl.com/y95erjwf.

New General English Dictionary (14th ed. 1771) ("People" "signifies every person, or the whole collection of inhabitants in a nation or kingdom").[2]   The Supreme Court in *Heller* consistently interpreted "the people" as "unambiguously refer[ring] to all members of the national community, not an unspecified subset."  554 U.S. at 580.  The phrase "the people" thus created a "strong presumption that the Second Amendment is exercised individually and *belongs to all Americans*."  *Id.* at 581 (emphasis added).  Indeed, *Bruen* cites *Heller* as directly stating, "[t]he Second Amendment guaranteed to '*all Americans*' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions.'"  *Bruen*, 142 S. Ct. at 2156 (emphasis added).

*Finally*, "the people" is a term of art with a consistent meaning across the Bill of Rights. *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990).  "Convicted felons fall within 'the people' as contemplated by the First and Fourth Amendments."  *Carrero*, 635 F. Supp. 3d at 1212.[3]  "Unless the meaning of the phrase 'the people' varies from provision to provision—and the Supreme Court in *Heller* suggested it does not—to conclude [Mr. Thompson] is not among 'the people' for Second Amendment purposes would exclude him from those rights as well." *Range*, 69 F.4th at 102; *see also cf. Heller*, 554 U.S. at 582, 592 (relying upon First and Fourth Amendment jurisprudence to interpret the Second Amendment—"it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right"); *Rowson*, 652 F. Supp. 3d at 461 (explaining that the Government's argument the felons are excluded from "the people" protected by the Second Amendment conflicts with *Heller*).

---

[2] Available at https://tinyurl.com/uk4b4fxd.

[3] *See, e.g.*, *Entler v. Gregoire*, 872 F.3d 1031, 1039 (9th Cir. 2017) (recognizing a prisoner's First Amendment right to seek redress of grievances "[r]egardless of the prisoner's misdeed—however reprehensible"); *United States v. Lara*, 815 F.3d 605 (9th Cir. 2016) (suppressing the unreasonable search of a felon's cell phone under the Fourth Amendment).

It is a cardinal rule of interpretation "that identical words used in different parts of the same [law] are generally presumed to have the same meaning." *IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005). The presumption of consistent meaning applies to the Bill of Rights because "the first ten amendments were adopted as a package"—that is, all together at the same time by the same Congress. *United States v. Meza-Rodriguez*, 798 F.3d 664, 670 (7th Cir. 2015) ("the term 'the people' in the Second Amendment has the same meaning as it carries in other parts of the Bill of Rights" and therefore extends to all "persons who are part of a national community"). There is "no principled way to carve out the Second Amendment" from the other Bill of Rights provisions and impose a different definition of "the people" in that amendment alone. *Id.* at 672; *see also Range*, 69 F.4th at 102 (finding "no reason to adopt an inconsistent reading of 'the people'" in the various constitutional provisions); *Jimenez-Shilon*, 34 F.4th at 1045 (seeing no "textual, contextual, or historical reason to think that the Framers understood the meaning of ['the people'] to vary from one provision of the Bill of Rights to another.").

Interpreting "the people" differently under the Second Amendment would "subject [the Second Amendment] to an entirely different body of rules than the other Bill of Rights guarantees," which the Supreme Court has expressly forbidden. *McDonald*, 561 U.S. at 780. Thus, courts must look to the other Bill of Rights provisions when defining "the people" under the Second Amendment. And given that a felony conviction does not exclude Mr. Thompson from "the people" under, for example, the First and Fourth Amendments, it does not exclude him under the Second.

**B.  Section 922(g)(1) violates the Second Amendment because there is no historical tradition of disarming felons in the founding era.**

Because the Second Amendment applies, "the Constitution presumptively protects [Mr. Thompson's alleged] conduct." *Bruen*, 142 S. Ct. at 2126.  To rebut this presumption, the government must establish that § 922(g)(1) is "consistent with this Nation's historical tradition of firearm regulation." *Id.* The government cannot carry that burden because there is no robust tradition of "distinctly similar" laws from the founding era.  Below will discuss (1) *Bruen's* new analytical framework for evaluating history; (2) how *Bruen*'s "distinctly similar" test applies; and (3) the dearth of "distinctly similar" felon disarmament laws during the founding era, meaning the government's prosecution is unconstitutional.

### 1. *Bruen* created a new analytical framework for evaluating history.

In *Bruen*, the Supreme Court set forth a two-track analysis under its historical component. The Court explained the standard for reviewing historical evidence depends on what kind of problem a statute is intended to address—specifically, whether that problem is old or new.  *Bruen*, 142 S. Ct. at 2131-32.  Old problems are "general societal problems that ha[ve] persisted since the 18th century." *Id.* at 2131.  New problems, by contrast, are those involving "unprecedented societal concerns or dramatic technological changes" that were "unimaginable at the founding." *Id.* at 2132.  Therefore, courts faced with a Second Amendment challenge must identify the problem at which the law was aimed and then determine whether that problem existed in 1791 or instead grows out of "unprecedented," "unimaginable" societal changes." *Id.* at 2132.  Only then will the court know which approach to employ.

*i. Track one: "distinctly similar."*  When the challenged law addresses an old problem, the test is "fairly straightforward": the government must identify a tradition of "distinctly similar"

laws from the founding era. *Bruen*, 142 S. Ct. at 2132; *see also Range*, 69 F.4th at 103. Although *Bruen* did not expressly define "distinctly similar," it indicated the standard is a stringent one. The only historical regulation *Bruen* identified as distinctly similar to New York's proper-cause requirement was an 1871 Texas law forbidding "anyone from 'carrying on or about his person . . . any pistol . . . unless he has reasonable grounds for fearing an unlawful attack on his person.'" *Bruen*, 142 S. Ct. at 2153 (citing 1871 Tex. Gen. Laws § 1). This "reasonable grounds" requirement was essentially identical to New York courts' interpretation of that state's proper-cause standard. *See id.* at 2123-24.

Bruen also noted that "*Heller* . . . exemplifies th[e] kind of straightforward historical inquiry" demanded by the "distinctly similar" test. *Id.* at 2131. *Heller* confirms that the standard is a strict one. When assessing the "total[] ban[]" on handgun possession at issue in *Heller*, the Supreme Court identified only two historical laws for comparison: a Georgia law and a Tennessee law, both of which prohibited the open carry of pistols. 554 U.S. at 628-29. *Bruen* and *Heller* both show that the focus of the "distinctly similar" test is on historical laws that are virtually identical to the modern law.

***ii. Track two: "relevantly similar."*** When the challenged law addresses a new problem, the test is "more nuanced." *Bruen*, 142. S. Ct. at 2132. Courts must determine if the challenged modern law fits into a "relevantly similar" tradition of historical laws. *Id.* The Supreme Court identified two "central considerations" for courts to determine if laws are relevantly similar: "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2133. In other words, the government need not identify a "historical twin," but it still must show that the regulations are aligned as to "*how* and *why* [they] burden a law-abiding citizen's right to armed self-defense." *Id.*

The "relevantly similar" test is less difficult for the government to satisfy because it allows for "analogical reasoning." *Id.* at 2132. But courts may use this test only when the challenged law is aimed at a societal problem that was "unimaginable at the founding." *Id.* It is not available when the challenged law addresses an old problem—that is, one which "has persisted since the 18th century." *Id.* at 2131. When a law addresses an old problem, it must satisfy the stringent "distinctly similar" test; there must be a historical tradition of laws that are virtually identical to the modern law. *Id.* at 2153; *Heller*, 554 U.S. at 628-29.

**iii. Relevant timeframe.** Regardless of whether the case calls for the stringent "distinctly similar" or the looser "relevantly similar" test, the relevant "historical tradition" is that which existed when the Second Amendment was ratified in 1791. *Bruen*, 142 S. Ct. at 2136. That is because "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Id.* (emphasis in original). Courts may look to the tradition of firearms regulation "before . . . and even after the founding" period but should do so with care. *Id.* at 2131-32. *Bruen* cautioned that "[h]istorical evidence that long predates [1791] may not illuminate the scope of the [Second Amendment] right if linguistic or legal conventions changed in the intervening years." *Id.* at 2136. Courts should not rely on practices "that had become obsolete in England at the time of the adoption of the Constitution and never [were] acted upon or accepted in the colonies." *Id.*

Likewise, courts must not "giv[e] postenactment history more weight than it can rightly bear." *Id.* While evidence "of how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century represent[s] a critical tool of constitutional interpretation," historical evidence becomes less probative the farther forward in time one goes from 1791. *Id.* at 2136-37. The Court recognized that "discussions of the right to keep and bear

arms" that took place after the Civil War (1865) provided less insight into the Second Amendment's original meaning than earlier sources because they took place roughly 75 years after its ratification (in 1791). *Id.* at 2137. Courts therefore should credit such later history to the extent it is consistent with prior practice but should otherwise afford it little weight. *See id.* After all, "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.* (emphasis in original); *see also id.* at 2154 n.28 (ignoring "20th-century historical evidence" because it is too far removed from 1791); *see also Range*, 69 F.4th at 104 ("[W]e are confident that a law passed in 1961—some 170 years after the Second Amendment's ratification and nearly a century after the Fourteenth Amendment's ratifications—falls well short of 'longstanding' for purposes of demarcating the scope of a constitutional right.").

Furthermore, the comparable tradition of regulation must be "well-established and representative." *Id.* at 2133; *see also id.* at 2137 (explaining that "a governmental practice" can guide [courts'] interpretation of an ambiguous constitutional provision" only if that practice "has been open, widespread, and unchallenged since the early days of the Republic."). A handful of "outlier[]" statutes or cases from a small number of "outlier jurisdictions" are not enough to establish a historical tradition. *Id.* at 2153, 2156. For instance, the Supreme Court doubted laws from three of the thirteen original colonies were enough to show a relevant tradition. *See id.* at 2142.

***iv. Government's burden.*** Finally, *Bruen* emphasized that "the burden falls on [the government] to show that [a law] is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2135; *Rahimi*, 144 S.Ct. 1897 ("We also clarified [in *Bruen*] that when the Government regulates arms-bearing conduct, as when the Government regulates other

constitutional rights, it bears the burden to 'justify its regulation'"). Consistent with "the principle of party presentation," courts are "entitled to decide a case based on the historical record compiled by the parties." *Bruen*, 597 U.S. at 2130 n.6. Accordingly, courts "are not obliged to sift the historical materials for evidence to sustain [a] statute. That is [the government's] burden." *Id.* at 2150. And insofar as there are "multiple plausible interpretations" of an ambiguous historical record, courts must "favor the one that is more consistent with the Second Amendment's command." *Id.* at 2141 n.11; *see also id.* at 2139 (concluding that where "history [is] ambiguous at best," it "is not sufficiently probative to defend" a law).

### 2. *Bruen*'s stringent "distinctly similar" test applies because § 922(g)(1) address a problem that was well-known in the founding era.

The government must satisfy the demanding "distinctly similar" test because § 922(g)(1) addresses a "general societal problem"—*i.e.*, felons' access to guns—that existed when the Second Amendment was ratified in the 18th century. *See, e.g, United States v. Griffin*, No. 21-cr-00693, 2023 WL 8281564, at *4 (N.D. Ill. Nov. 30, 2023) (applying the distinctly similar standard because "the problems of crime and recidivism have always existed in this nation."). To do so, the government must show a robust tradition of comparable laws around 1791. *See Bruen*, 142 S. Ct. at 2153 (comparing challenged law to virtually identical Texas law); *Heller*, 554 U.S. at 628-29 (comparing challenged law to two virtually identical laws). A historical law that is "distinctly similar" to § 922(g)(1) would thus be one that either denied or substantially abridged felons' access to firearms.

### 3. The government cannot carry its burden to show that § 922(g)(1) is "consistent with the Nation's historical tradition of firearm regulation" because felon disarmament laws did not exist until the 20th century.

The government cannot carry its burden to show that § 922(g)(1) are "consistent with the Nation's historical tradition of firearm regulation" for a simple reason: neither felon disarmament laws, nor anything approximating them, existed until the 20th century. Indeed, before *Bruen* was decided, the U.S. Department of Justice took that position that founding-era American history did *not* support felon disarmament. *See* U.S. Brief in *United States v. Staten*, No. 10-5318, 2011 WL 1542053, at *25 (4th Cir. Apr. 25, 2011) ("As for convicted criminals, Colonial societies do not appear to have categorically prohibited their ownership of firearms."). As the government previously represented to other courts of appeals, the federal felon in possession statute, 18 U.S.C. § 922(g)(1), "is firmly rooted in the twentieth century and likely bears little resemblance to laws in effect at the time the Second Amendment was ratified." U.S. Brief in *United States v. Pettengill*, No. 10-2024, 2011 WL 1977759, at **27-28 (1st Cir. May 13, 2011).

The government was correct. The journey to what is now § 922(g)(1) began with the Federal Arms Act of 1938 (FFA). *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (citing c. 850, § 2(f), 52 Stat. 1250, 1251 (1938)). At that time, the law did not disarm *all* felons, but only those who were convicted of a "crime of violence," which the Act defined as "murder, manslaughter, rape, mayhem, kidnapping, burglary, housebreaking; assault with intent to kill, commit rape, or rob; assault with a dangerous weapon, or assault with intent to commit any offense punishable by more than one year." Federal Firearms Act, Pub. L. No. 75–785, 52 Stat. 1250 (1938).

In 1961, Congress expanded the FFA's scope by prohibiting "*all* felons," not just those convicted of specified violent crimes, from engaging the proscribed conduct. *See An Act to*

*Strengthen the Federal Firearms Act*, Pub. L. No. 87-342, 75 Stat. 757 (1961).  Seven years later, "Congress changed the 'receipt' element of the 1938 law to 'possession,' giving 18 U.S.C. § 922(g)(1) its current form." *Skoien*, 614 F.3d at 640.

State felon-in-possession laws have similar pedigrees.  They began to emerge in the 1920s, well over a century after the Second Amendment's enactment.  *See* C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 708 (2009); Adam Winkler, Heller*'s Catch-22*, 56 UCLA L. Rev. 1551, 1563 (2009).  In fact, "[t]he first felon-in-possession law was enacted ... in an attempt by a gun-rights organization to fend off the spread" of the handgun licensing regime that the Supreme Court struck down in *Bruen*. D. Jay Kaplan, Heller *Freezes over: Dangerous Persons and Felon-in-Possession Laws*, 96 Temp. L. Rev. 317, 324 (2024).

In other words, felon in possession laws are "firmly rooted in the twentieth century." *Booker*, 644 F.3d at 24.  The *Bruen* Court said it would not even "address any of the 20th-century historical evidence brought to bear by respondents or their amici," since evidence of that type "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.* at 2154 n.28.  Regulations of such recent vintage cannot establish a historical tradition unless they "confirm[]" earlier practice.  *Bruen*, 142 S. Ct. at 2137; *see also Range*, 69 F.4th at 104 (finding any reliance on the 1938 Federal Firearms Act "a dubious proposition given the *Bruen* Court's emphasis on Founding- and Reconstruction-era sources").

Here, § 922(g)(1) do not confirm an earlier practice.  Even Justice Breyer in his dissent in *Bruen* specifically referenced the recent "historical pedigree" of felon-in-possession laws:

> The Court disregards "20th-century historical evidence." But it is worth noting that the law the Court strikes down today is well over 100 years old, having been enacted in 1911 and amended to substantially its present form in 1913.  That alone gives it

a longer historical pedigree than at least three of the four types of firearms regulations that *Heller* identified as "presumptively lawful." 554 U.S. at 626–627, and n. 26, 128 S.Ct. 2783; see C. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L. J. 1371, 1374–1379 (2009) (concluding that " 'prohibitions on the possession of firearms by felons and the mentally ill [and] laws imposing conditions and qualifications on the commercial sale of arms' " have their origins in the 20th century); *Kanter v. Barr*, 919 F.3d 437, 451 (CA7 2019) (Barrett, J., dissenting) ("Founding-era legislatures did not strip felons of the right to bear arms simply because of their status as felons"). Like Justice KAVANAUGH, I understand the Court's opinion today to cast no doubt on that aspect of *Heller*'s holding. . . . But unlike Justice KAVANAUGH, I find the disconnect between *Heller*'s treatment of laws prohibiting, for example, firearms possession by felons or the mentally ill, and the Court's treatment of New York's licensing regime, hard to square. The inconsistency suggests that the Court today takes either an unnecessarily cramped view of the relevant historical record or a needlessly rigid approach to analogical reasoning.

*Bruen*, 142 S. Ct. at 2184 (Breyer, J., dissenting). The majority opinion voiced no disagreement with this characterization of the recency of the felon-in-possession laws—nor could it.

Felon-in-possession laws "bear[] little resemblance to laws in effect at the time the Second Amendment was ratified." *N.R.A. v. A.T.F.*, 700 F.3d 185, 196 (5th Cir. 2012). In 2007, a history professor at the University of Hartford undertook "a full survey of printed session laws pertaining to gun regulation in the thirteen colonies and Vermont between 1607 and 1815." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*, 25 Law & Hist. Rev. 139, 143 & n.11 (2007). Based on that survey, Professor Churchill concluded that "at no time between 1607 and 1815 did the colonial or state governments of what would become the first fourteen states exercise a police power to restrict the ownership of guns by members of the body politic." *Id.* at 142. A professor at the University of California-Davis School of Law agrees with Professor Churchill, noting that "state laws prohibiting felons from possessing firearms or denying firearms license to felons date from the early part of the twentieth century." Carlton F.W. Larson, *Four Exceptions in Search of a Theory*, 60 Hastings L.J. 1371, 1376 (2009).

14

Other scholars agree. Although it is difficult "to prove a negative, one can with a good degree of confidence say that bans on convicts possessing firearms were unknown before World War I." C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 708 (2009). It appears that no state passed a felon-disarmament law until 1923. *Id.*; *see also* Adam Winkler, Heller*'s Catch-22*, 56 UCLA L. Rev. 1551, 1563 (2009) ("Bans on ex-felons possessing firearms were first adopted in the 1920s and 1930s, almost a century and a half after the Founding."); Nelson Lund, *The Second Amendment,* Heller*, and Originalist Jurisprudence*, 56 UCLA L. Rev. 1343, 1357 (2009) (similar).

In short, there was no historical tradition around 1791 of gun regulations "distinctly similar" (or even "relevantly similar") to § 922(g)(1). *See Range*, 69 F.4th at 104. The "Founders themselves could have adopted" felon-disarmament laws to address the "perceived societal problem" posed by felons' access to guns. *Bruen*, 142 S. Ct. at 2131. But they did not. *See Kanter*, 919 F.3d at 451 (Barrett, J., dissenting) ("Founding-era legislatures did not strip felons of the right to bear arms simply because of their status as felons."). Such laws were not passed until the 20th century. Regulations of such recent vintage cannot establish a historical tradition. *Id.* at 2137. Because § 922(g)(1) does not fit in a robust historical tradition of distinctly similar regulations, it is unconstitutional.

### C. The evidence regularly relied on by the government to support disarmament does not meet its constitutional burden

In defending felon-in-possession laws, the government has relied on a grab bag of authority, none of which carries its burden. For example, it often cites to laws regarding "Catholics in England who were disarmed for refusing to renounce their faith, Native Americans and enslaved Black people in Colonial America who were disarmed for not being dependable

adherents to the rule of law, and individuals who were disarmed for failing to take oaths of loyalty to the government during the Revolutionary War." *United States v. Glass*, No. 24-CR-30124-SMY, 2025 WL 2771011, at *4 (S.D. Ill. Sept. 29, 2025). In addition, the government regularly relies on the fact that certain crimes "were punishable by death and forfeiture of estate in Colonial America." *Id.*

These laws do not carry the government's burden. Laws disarming Catholics, Native Americans, and enslaved Black people "reflect[ed] the English tradition of categorically disarming religious, ethnic, and racial minorities." *Id.* They were "justified solely on discriminatory bases," and (even assuming the looser relevantly similar standard applies) do not carry the government's burden to point to laws that were "comparably justified." *Id.* Furthermore, these groups were generally not considered members of "the people" at the time of the founding. *See generally Dred Scott v. Sandford*, 60 U.S. 393, 15 L. Ed. 691 (1857), superseded by constitutional amendment (1868). These laws say nothing about the scope of proper regulations under the Second Amendment for those entitled to its protections.

Founding era laws requiring the swearing of a loyalty oaths also are not analogous to 992(g)(1). Those unwilling to swear oaths of loyalty were often considered outside the American political community. See *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1048 (11th Cir. 2022) ("By refusing to take an oath of allegiance to the state, those associated with foreign governments renounced their membership in the American political community and, in doing so, forfeited the state's protection of their right to arms—even if they continued to live on American soil."). And so, similar to laws banning firearm possession by enslaved persons, Native Americans, and Catholics, these laws provide no insight into the scope of the Second Amendment for those entitled to its protections. In any event, even if they did, "individuals were permitted to regain their right

16

to possess firearms" upon swearing an oath of allegiance. *Glass*, 2025 WL 2771011, at \*5; *Prince*, 700 F. Supp. 3d at 672; Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & Hist. Rev. 139, 157-58 (2007); Marshall, 32 Harv. J.L. & Pub. Pol'y 695, 722-25 (2009) (explaining loyalty statutes "did not technically prohibit recusants from acquiring new arms," since they "read more like forfeiture laws than disabilities").    Therefore, those laws therefore do not impose a "comparable burden" to § 922(g)(1)'s lifetime ban.  *Glass*, 2025 WL 2771011, at \*5.  And "by the time of the founding," "state constitutions and the Second Amendment had largely eliminated governmental authority to disarm political opponents on this side of the Atlantic." *United States v. Rahimi*, 602 U.S. 680, 694 (2024).

Finally, the government's reliance on laws imposing capital punishment and estate forfeiture for felonies cannot carry its burden either.  "The consequences imposed by these laws, ... 'do[ ] not suggest that the particular (and distinct) punishment at issue—lifetime disarmament—is rooted in our Nation's history and tradition.'"  *Glass*, 2025 WL 2771011, at \*5 (quoting *Range v. Att'y Gen.*, 69 F.4th 96, 105 (3d Cir. 2023), *cert. granted, judgment vacated sub nom. Garland v. Range*, 144 S. Ct. 2706 (2024)). The "founding-era governments' execution of some individuals convicted of certain offenses does not mean the State, then or now, could constitutionally strip a felon of his right to possess arms if he was not executed." *Id.* (quoting *Range*, 69 F.4th at 105). Under this theory, any defendant convicted of a death eligible offense would lose all their rights— to free speech, to the free exercise of religion, and against unreasonable searches and seizures— even if they were not sentenced to death, completed their sentences, and were released. But, of course, that is not the law. *See Kanter*, 919 F.3d at 462 (Barrett, J., dissenting) ("[W]e wouldn't say that the state can deprive felons of the right to free speech because felons lost that right via

execution at the time of the founding."); *Folajtar v. Att'y Gen. of the United States*, 980 F.3d 897, 921 (3d Cir. 2020) (Bibas, J., dissenting) (Nor would we say that "because the state used to execute felons, it may now permanently strip them of their freedom of religion.").

**D. Assuming, for the sake of argument, that the government has met its burden to establish that some categories felons can be disarmed, that historical tradition would not apply to Mr. Thompson.**

Some courts have suggested that historical evidence, while it does not support disarming all felons, does support disarming a sub-category of "dangerous" felons. *See Griffin*, 2023 WL 8281564, at *8; *Kanter*, 919 F.3d at 451, 454, 464 (Barrett, J., dissenting); *Folajtar*, 980 F.3d at 912-15 (Bibas, J., dissenting). And others have suggested that historical evidence supports only disarming felons convicted of prior offenses that, at the founding, were punishable by death, life imprisonment, or permanent estate forfeiture or were convicted of modern offenses that are analogous to offenses that were so punished at the founding. *See United States v. Duarte*, 101 F.4th 657, 689-90 (9th Cir. 2024) *reh'g en banc granted, opinion vacated*, 108 F.4th 786 (9th Cir. 2024).

For many reasons, these cases were wrongly decided. *See Range*, 69 F.4th 105 n.9 (explaining that the government had failed to come forth with sufficient evidence under *Bruen* to supporting a "dangerousness" standard for felon disarmament); *Range*, 69 F.4th at 105 (explaining that the fact "[t]hat Founding-era governments punished some nonviolent crimes with death does not suggest that the particular (and distinct) punishment at issue—lifetime disarmament—is rooted in our Nation's history and tradition. The greater does not necessarily include the lesser."); *see also* U.S. Pet. in *Att'y Gen. v. Range*, No. 23-374 at 21-22 (S. Ct. Oct. 5, 2023) (explaining that a "danger" regime is not "feasible," and that determining whether an individual poses "a danger to public safety" is "a very difficult and subjective task"). But even assuming some

"dangerous" felon-test applies, the government cannot establish that it justifies disarming Mr. Thompson in particular. Nor can it establish that there was a robust tradition of punishing Mr. Thompson predicates with death, life imprisonment, or permanent estate forfeiture at the founding.

The only one of Mr. Thompson's prior felonies that could be deemed "dangerous" is his robbery conviction from over 15 years ago (DC Superior Court Case No. 2010-CF3-011990). At the time, Mr. Thompson was not even 20 years old—a youth by D.C. code's modern standard.[4] The government cannot show that that this felony or his prior gun possession offenses were punishable by death, life imprisonment, or permanent estate forfeiture at the founding. "The notion that all felons . . . were historically put to death or stripped of their estates is 'shaky' to begin with." *Duarte*, 2024 WL 2068016, at \*22. In England, few felonies "were punished with death." *Id.* And in this country "felony" was historically "a term of loose signification." *Id.* There "were many felonies on the books in the late 18th-and early 19th-century, not one punished with forfeiture of estate, and but a very few with death." *Id.*

Furthermore, many present-day felonies were "classified as misdemeanors, or nonexistent," at the founding. *Id.* Throughout "the seventeen and eighteen centuries, capital punishment in the colonies was used 'sparingly,' and property crimes including variations on theft, burglary, and robbery 'were, on the whole, not capital.'" *Kanter*, 919 F.3d at 459 (Barrett, J. dissenting). Moreover, "[m]ost punishments were temporary." *Foljtar*, 980 F.3d at 923 (Bibas,

---

[4] Council of the District of Columbia, Code of the District of Columbia: Definitions, https://code.dccouncil.gov/us/dc/council/code/sections/24-901 ("'Youth offender' means a person 24 years of age or younger at the time that the person committed a crime other than murder, first degree murder that constitutes an act of terrorism, second degree murder that constitutes an act of terrorism, first degree sexual abuse, second degree sexual abuse, and first degree child sexual abuse.").

J., dissenting).  And the "colonists did not treat ex-cons as a permanent exiled underclass," forever disbarred from possessing a weapon.  *Id.*  Rather, "[o]nce wrongdoers had paid their debts to society, the colonists forgave them and welcomed them back into the fold."  *Id.*  Even laws preventing minors from owning certain firearms were not lifetime bans, but temporary ones limited to the duration of youth. *See, e.g.*, Act of July 13, 1892 ch. 159 Section 5, 27 Stat. 117 (D.C.) (banning pistols for minors); 1890 La. Acts 39, Section 1 (banning sale of concealable weapons to minors). The government can point to no historical precedent supporting the *lifetime* disarmament of a youthful offender, and certainly not based on a youthful offense from over 15 years ago.

For these reasons, even if this Court were to adopt some sort of dangerousness-felony test or a test the looks to punishment at the founding, § 922(g)(1) would still be unconstitutional as applied to Mr. Thompson.

**E. The D.C. Circuit's Second Amendment decisions regarding felon-in-possession laws are no longer controlling or persuasive after *Bruen*.**

Before *Bruen*, the D.C. Circuit had rejected Second Amendment challenges to § 922(g)(1) in *Schrader v. Holder*, 704 F.3d 980 (D.C. Cir. 2013) and *Medina v. Whitaker*, 913 F.3d 152 (D.C. Cir. 2019).  Neither of these cases can survive *Bruen*.

In *Schrader*, the D.C. Circuit held that § 922(g)(1) survived a facial constitutional challenge, but its reasoning was premised predominately on the means-end analysis.  *See Schrader*, 704 F.3d at 293.  *Bruen* leaves no room for doubt: text and history, *not* a means-end analysis, define the Second Amendment's protections.  *See Bruen*, 142 S. Ct. at 2127.  As such, *Bruen* abrogated *Schrader.*

Similarly, the D.C. Circuit in *Medina* built off *Schrader* to reject an as-applied challenge to § 922(g)(1). The D.C. Circuit held that "those convicted of felonies are not among those entitled to possess arms." *Medina*, 913 F.3d at 160. But *Medina* is no longer controlling or persuasive after *Bruen* for a number of reasons.

**First**, the comprehensive historical and plain language analysis conducted by the Third Circuit, as now required by *Bruen*, was absent from the D.C. Circuit's pre-*Bruen Medina* decision. Such an analysis demonstrates felons are included in "the people" protected by the Second Amendment, and the government cannot meet its burden of showing § 922(g)(1) is consistent with this Nation's historical tradition of firearm regulation. *Range*, 69 F.4th at 104 (citing *Bruen*, 142 S. Ct. at 2130). Because *Bruen*'s new analytical framework did not exist at the time *Medina* was decided, the D.C. Circuit did not apply the appropriate framework or presumptions, making its entire analysis flawed from the outset. Indeed, the Third Circuit expressly considered *Medina* after *Bruen* was decided and found it to be unpersuasive. *See Range*, 69 F.4th at 106; *United States v. Leblanc*, -- F. Supp. 3d --, 2023 WL 8756694, at *8 (M.D. La. Dec. 19, 2024) (noting *Medina* "suffers [from] the analytical shortcomings rejected in *Bruen*").

**Second**, the burden analysis was not properly conducted in *Medina*. In *Range*, for instance, the government was unable to cite "a single statute or case that preclude[d] a convict who has served his sentence from purchasing that same type of object that he used to commit the crime" or even any "forfeiture cases in which the convict was prevented from regaining his possessions, including firearms (except where forfeiture preceded execution)." *Range*, 69 F.4th at 105. And in *Medina*, the D.C. Circuit acknowledged the dearth of founding-era regulations disarming individuals simply because they had a past conviction. *See* 913 F.3d at 161 (recognizing there were "few primary sources directly on point"). Yet, the D.C. Circuit rejected the challenge

to § 922(g)(1) because "[the defendant] had not presented evidence in this case" that showed felons were allowed to possess firearms during the founding era.  *See id.*  But *Bruen* shows the D.C. Circuit had the burden exactly backwards: it is the government's burden to show the existence of disarmament regulations, not the defendant's burden to show the absence of them. 142 S. Ct. at 2135.

 ***Third,*** while *Medina* conducted some historical analysis, it was unmoored from *Bruen*'s analytical framework.  *Bruen* requires that the regulations targeting longstanding problems must be "*distinctly similar*" (or at least "relevantly similar") to a historical analogue of firearm regulations. 142 S. Ct. 2131.  Nowhere does the *Medina* court identify such an analogue.  Instead, it relied predominately on the belief that "founding-era felons" were often punished with "death" and "estate forfeiture" and so found it "difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms."  913 F.3d at 158.  That misses the mark.  Indeed, the Seventh Circuit just recently faulted the government's reliance on this argument: "that felons like [defendant] were historically subject to execution and estate forfeiture, as well as the loss of other civic rights" presents "nothing close to what would satisfy the demanding standard set forth in *Bruen*."  *Atkinson v. Garland*, 70 F.4th 1018, 1022 (7th Cir. 2023).  And, while the Ninth Circuit has seemed to adopt this argument to some degree, it has squarely rejected the idea that this logic applies to all offenses deemed felonies today, rather than those offenses which were capitol offenses or publishable by life imprisonment or permanent asset forfeiture at the founding. *See Duarte*, 101 F.4th 689-90.  As several jurists have recognized after *Medina* was decided, the factual underpinnings of its holding are "shaky."  *Kanter*, 919 F.3d at 459 (Barrett, J. dissenting).  As noted, the term felony was not used at the founding to merely refer to offenses punished by death.  *See supra* II.E.

More fundamentally, *Medina*'s focus on the historical treatment of felons that were executed tells us nothing about whether there is a historical tradition of disarming *surviving* felons of their rights after they have returned to society, let alone those, as Mr. Thompson here, who were never convicted of a death-eligible crime to begin with. *See Kanter*, 919 F.3d at 462 (Barrett, J., dissenting). The two are not "distinctly similar" or even "relevantly similar." After all, "we wouldn't say that the state can deprive felons of the right to free speech because felons lost that right via execution at the time of the founding." *Id.* (Barrett, J., dissenting). Nor would we say that "because the state used to execute felons, it may now permanently strip them of their freedom of religion." *Flajtar*, 980 F.3d at 921 (Bibas, J., dissenting). "The obvious point that the dead enjoy no rights" is thus not a sufficient historical analogue for "what the founding-era generation would have understood of felons who lived, discharged their sentences, and returned to society." *Kanter*, 919 F.3d at 462 (Barrett, J., dissenting); *see also Taylor*, 2024 WL 245557, at *5 (finding capital punishment laws distinguishable, in part, because "they were imposed for criminal conduct; not for status crimes that arose from otherwise lawful conduct by felons who had completed their sentences").

**Fourth**, the historical sources *Medina* relied upon would no longer be sufficient under *Bruen*. For example, *Medina* cited to a "1787 *proposal* before the Pennsylvania ratifying convention, where the Pennsylvania Minority suggested adding language to its Constitution that "no law shall be passed for disarming the people or any of them *unless for crimes committed,* or real danger of public from individuals." *Medina*, 813 F.3d at 158 (first emphasis added). This historical evidence has no relevance under *Bruen*'s analytical framework because the Pennsylvania Minority did not convince Pennsylvania, much less the rest of the states, to adopt it. *Rahimi*, 144 S. Ct. at 1936 (Thomas, J., dissenting) (finding such "proposals carry little

interpretative weight" because "it is 'dubious to rely on [drafting] history to interpret a text that was widely understood to codify a pre-existing right'" (quoting *Heller*, 554 U.S. at 603)).[5]  An unadopted proposal is not a widely held understanding of a right; nor is it analogous to this "Nation's historical tradition of firearm regulation"—indeed, an unadopted proposal is not a "regulation" at all.  *See Bruen*, 142 S. Ct. at 2126 (emphasis added); *see also cf. id.* at 2153, 2156 (discussing how a handful of "outliers" from a small number of "outlier jurisdictions" are not enough to establish a historical tradition); *Kanter*, 919 F.3d at 455 (Barrett, J., dissenting) (noting "none of the [proposal's] relevant limiting language made its way into the Second Amendment").

        The *Medina* court next cited to disarmament laws against Loyalists in Massachusetts and Pennsylvania during the revolutionary period, but *post-Bruen*, several circuits have found these to be "far too broad" and distinguishable to satisfy *Bruen*'s demands.  *Range*, 69 F.4th at 105; *Rahimi*, 61 F.4th 433, 456 (2023) *rev'd on other grounds by* 144 S.Ct. 1889 (finding analogies to "disloyal" people distinguishable and "dubious, at best"); *see also*, *Kanter*, 919 F.3d at 453 (Barrett, J., dissenting) (reviewing Massachusetts and Pennsylvania laws and finding "neither the convention proposals nor historical practice supports a legislative power to categorically disarm felons because of their status as felons."); *Taylor*, 2024 WL 245557, at *5 (finding Loyalist laws distinct because they permitted individuals "to regain their right to possess firearms by swearing an oath of allegiance" whereas § imposes "lifetime dispossession and criminalization"—"a significantly greater burden").  Indeed, Justice Thomas in his dissent in *Rahimi*—in an observation which was not disagreed with by the majority—expressly noted that these sources "carry little interpretative weight."  *Rahimi*, 144 S. Ct. at 1936 (Thomas, J., dissenting).

_____

[5] The majority opinion did not disagree with Justice Thomas on this point.

**Fifth,** *Medina* greatly relied upon the Supreme Court's statement in *Heller* that "nothing in our opinion should be taken to cast doubt on the longstanding prohibitions on the possession of firearms by felons," 554 U.S. at 627, but *Rahimi* and *Bruen* confirm that statement was non-binding dicta in at least three ways.  For starters, the majority opinion in *Rahimi* faulted the government for attempting to limit the scope of the Second Amendment to only "responsible" or "law-abiding" citizens, noting that line does not "derive from our case law" and was never "presented."  *Rahimi*, 144 S. Ct. at 1903; *see also id.* at 1944-45 (Thomas, J., dissenting) ("In reality, the 'law-abiding, dangerous citizen' test is the Government's own creation, designed to justify every one of its existing regulations.  It has no doctrinal or constitutional mooring.").

Moreover, the majority opinion in *Bruen* did not recommit to upholding felon-in-possession laws; rather, that admonition appeared only in a concurring opinion.  This was no oversight.  Justice Thomas, the author of the *Bruen* majority opinion, previously recognized in *Voisine v. United States*, 579 U.S. 686, 715 (2016) that *Heller's* discussion of felon disarmament laws was unquestionably "dicta."  Indeed, *Heller* itself stated that "there will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us," 554 U.S. 570, 635, thus making clear it was not deciding that issue.

Likewise, in the same paragraph that *Heller* casually referred to § 922(g)(1) as a "long standing prohibition" without doing an "exhaustive historical analysis of the full scope of the Second Amendment," 554 U.S. at 626, the Court also stated that "the majority of the 19th century courts to consider the question [of carrying concealed weapons] held that such prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues."  *Id.* (citing two cases and two treatises as support).  Despite this, 14 years later in *Bruen*, the Court reconsidered that question anew.  It conducted an exhaustive historical analysis and applied a new

and very strict burden of rules.  And after doing so, it concluded that the government had *not* met

its "burden to identify" a "distinctly similar" "American tradition" justifying New York's proper

cause restriction on the public carrying of firearms.  *Bruen*, 142 S. Ct. at 2156.  If *Heller's* casual

description of concealed-carry bans as "longstanding" and "constitutional" had been a dispositive

holding rather than dicta, *Bruen* would have been an easy case—the Court would simply have

deferred to *Heller's* approval of such laws and upheld New York's statute on that basis.  But of

course, that is not what the Court did.  It reached the opposite conclusion of its offhand remark in

*Heller*, holding that some laws burdening concealed carry are *unconstitutional*.  Thus, *Bruen*'s

explicit contradiction of *Heller*'s dicta regarding the longstanding nature of concealed-carry bans

is proof that the D.C. Circuit's reliance on the same "longstanding prohibition" dicta regarding

felon dispossession was misplaced.

After *Bruen*, many courts have rightly recognized that this single *Heller* sentence was

indeed non-binding dicta.  *See, e.g.*, *Range*, 69 F.4th at 104; *Atkinson v. Garland*, 70 F.4th at 1022

(rejecting government's reliance on "oft-quoted dicta describing felon-in-possession laws as

'presumptively lawful," because "[n]othing allows us to sidestep *Bruen* in the way the government

invites.").

**Finally**, *Medina* rejected the defendant's argument that non-dangerous felons could be

disarmed because "dangerousness" was too "amorphous" a touchstone for disarmament.  *Medina*,

913 F.3d at 160.  But the Supreme Court specifically found in *Rahimi* that dangerousness—*i.e.*,

whether someone posed a "credible threat to the physical safety of another" could be an

appropriate touchstone.  *Rahimi*, 144 S. Ct. 1889, 1894 (2024).

All told, the D.C. Circuit's pre-*Bruen* precedent cannot be reconciled with *Bruen and*

*Rahimi* because it did not engage in the analytical framework *Bruen* requires.  It failed to apply

appropriate presumptions, burdens, or engage in the extensive historical analysis for "distinctly similar" prohibitions on firearm possession by felons during the founding era. Because the D.C. Circuit has never engaged in the appropriate analysis, this Court must. And, as discussed, doing so leads to the inevitable conclusion that § 922(g)(1) is unconstitutional on its face and as applied to Mr. Thompson. The indictment must be dismissed.

**CONCLUSION**

Mr. Thompsons's possession of a firearm is protected by the Second Amendment. The government cannot carry its burden to show a historical tradition of "distinctly similar" (or even "relevantly similar") lifetime prohibitions on firearm possession by felons because such laws are creatures of the 20th century. As such, the government's prosecution of Mr. Thompson violates the Second Amendment, both facially and applied, and the indictment must be dismissed.

Respectfully submitted,

A. J. KRAMER
Federal Public Defender

_____/s/_____
MICHELLE PETERSON
ISRA BHATTY
Assistant Federal Public Defender
Federal Public Defender's Office
625 Indiana Ave NW, Suite 550
Washington, D.C. 20004